## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | |
| v. | |
| **TREASURE ENTERPRISE LLC, PATRICIA ENRIGHT GRAY, and LARRY ALLEN HOLLEY,** | **No. 17-cv-10963** **Hon. Marianne O. Battani** |
| Defendants, | **JURY DEMANDED** |
| and | |
| **KINGDOM ASSET MANAGEMENT LLC and CARLEEN RENEE HOLLEY,** | |
| Relief Defendants. | |

### [UNDER SEAL]

### COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges:

1.     The SEC brings this civil law enforcement action to shut down an ongoing, Michigan-based offering fraud involving at least $6.7 million, much of which came from retirees and senior citizens, living in Michigan and elsewhere. The fraud is being perpetrated by defendants Treasure Enterprise LLC ("Treasure"), Patricia Enright Gray ("Gray"), and Larry Allen Holley ("Holley"). Defendants targeted retirees and laid-off auto workers with severance plans, among others.

2.     They targeted these investors in churches. Holley, a pastor who held

himself out as a successful businessman, cloaked his solicitations in faith-based rhetoric, replete with references to scripture and biblical figures. Investors were drawn to, and put their trust in, Holley and Gray because of their seemingly shared spirituality. Holley told prospective investors that, as a person who "prayed for your children," he was more trustworthy than a "banker."

3.     Prospective investors also found appealing the high interest rates defendants promised – far higher than what they could earn from certificates of deposit or other, conservative investments. And they found it important that at the end of the agreed-upon term of investment, Treasure would return all of their principal back to them.

4.     In addition to churches, defendants solicited investors on the internet and through social media. Gray advertised on a Flint-based Christian/gospel radio station. In the ads, she held herself out as a "personal financial wealth coach."

5.     Defendants typically touted Treasure as a successful, profitable, real estate company with hundreds of residential and commercial properties. Prospective investors were told that, given the profitability of Treasure's real estate business, Treasure could offer investors high, fixed, and guaranteed interest payments. Investors were told that Treasure had a full, money back guarantee for any unsatisfied investor. Gray told investors that an investment in Treasure was risk-free, since it had ample cash reserves to cover early redemption requests. Such assurances were important to investors.

6.     Prospective investors were told that their money at Treasure would be kept in a qualified Individual Retirement Account, which meant retirement proceeds

could be rolled over into Treasure tax-free. Gray told at least one investor that Treasure's IRA was monitored by an independent, third-party custodian. Many investors' willingness to invest with Treasure depended upon it having a qualified IRA. Investors expressly told Gray as much.

7.     From February 2015 until recently, approximately 83 individuals invested with Treasure. Some turned over their entire life savings.

8.     Only later did investors learn there was nothing guaranteed or risk free about their Treasure investment. For most investors, the trouble began when Treasure stopped sending them their agreed-upon interest payments, or when they tried availing themselves of Treasure's money back guarantee. Instead of making the agreed-upon payments or honoring the redemption requests, however, defendants offered only excuses and delays. To date, Treasure owes more than 40 investors about $2 million in promissory notes that are past due – and that's only Treasure's Michigan-based investors. On information and belief, Treasure also has outstanding obligations to its investors living outside the State of Michigan.

9.     As its troubles mounted, defendants continued soliciting new investment proceeds in an effort to keep Treasure afloat. They did so by making the misrepresentations described above – about Treasure's success, its profitability, the promise of high, guaranteed returns, and at the end of the investment period the safe return of an investor's entire principal.

10.     The SEC brings this lawsuit to put an immediate stop to the defendants' ongoing misconduct; to marshal and safeguard assets; to prevent further harm to investors; and to hold defendants accountable for their misdeeds.

## JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 [15 U.S.C. §77t(b)] ("Securities Act") and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 [15 U.S.C. §§78u(d) and 78u(e)] ("Exchange Act").

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan and elsewhere.

14.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS AND RELIEF DEFENDANTS

15.     **Defendant Treasure Enterprise LLC** is a Michigan limited liability company formed by Holley in 2009 and based in Flint, Michigan. Treasure purports to purchase, invest in and manage residential and commercial real estate. From February 2015 to the present, Treasure raised approximately $6.7 million from 83 investors. Treasure is not registered with the SEC.

16.     **Defendant Larry Allen Holley**, age 59, currently resides in Grand Blanc, Michigan. Holley is a pastor of Abundant Life Ministries International, Inc.

("Abundant Life"), a church in Flint, Michigan. Holley is also the founder and president of Treasure and relief defendant Kingdom Asset Management LLC. Holley does not hold any securities licenses and has never been registered with the SEC.

17.    **Defendant Patricia Enright Gray**, age 55, currently resides in Flint, Michigan. Gray is a financial consultant on behalf of Treasure and Kingdom Asset Management LLC. Gray is also affiliated with Abundant Life. Gray does not hold any securities licenses and has never been registered with the SEC.

18.    **Relief Defendant Carleen Renee Holley**, age 53, currently resides in Grand Blanc, Michigan. Carleen Holley is married to Larry Holley. She is also affiliated with Abundant Life, and works for Treasure and Kingdom Asset Management LLC. Carleen Holley does not hold any securities licenses and has never been registered with the SEC.

19.    **Relief Defendant Kingdom Asset Management LLC** ("Kingdom Asset") is a Michigan limited liability company formed by Holley and his wife Carleen Holley in 2006. It is based in Flint, Michigan. Kingdom Asset purports to purchase, invest in and manage residential and commercial real estate. Holley serves as its President. Kingdom Asset is an affiliate of Treasure and shares the same address as Treasure and Abundant Life. Kingdom Asset's officers, employees and associates are also affiliated with Treasure. On information and belief, Kingdom Asset raised funds from investors. Kingdom Asset is not registered with the SEC.

## FACTS

### Defendants' Investment Pitch Resonates With Prospective Investors

20.    Defendants broadly advertised over social media websites and bragged about their professional success. Holley's bio, posted on various social media outlets and websites, stated that he "has been gifted to inspire thousands of individuals to discover God's promises and apply practical solutions for experiencing financial increase." Holley's bio also touted that he "has successfully created, managed and prospered in various businesses over 30 years."

21.    Gray advertised on a religious radio station based in Flint, Michigan. She claimed to be a "personal wealth coach." She promised to help listeners "make your money work for you!" She singled-out recently laid-off auto workers with severance packages to consult her for a "financial increase."

22.    When prospective investors met with Gray, they were handed her business card, on which she boasted: "I've helped hundreds of men and women earn, save and invest millions of dollars and I can help you."

23.    Defendants made financial presentations at churches nationwide, which Treasure promoted as "Blessed Life Conferences." Holley – who marketed himself as a pastor, businessman and philanthropist – would begin the conferences with a sermon to the congregation.

24.    A video of one such sermon is available on the internet. During that sermon Holley repeatedly urged congregants to fill out cards detailing their financial holdings. Holley promised to pray over the cards. He then promised that Gray would take the cards and have one-on-one consultations with any interested congregants.

To encourage such one-on-one consultations, Holley recounted how, thanks to Gray, one investor who had been earning a mere $300 a month from his savings now enjoyed $3000 a month – all from "the same money."

25.     Holley repeatedly told congregants that his investors were "millionaires in the making." He encouraged congregants to embrace "sowing" their money with him and his business. Holley told them that they will "not lose" if they invest in real estate.

26.     Holley then handed off selected congregants to Gray for one-on-one "consultations." Gray told prospective investors that she would help them find money that they did not know they had. She promised to make their money "increase" and "multiply."

27.     During those sessions, Gray would describe to the prospects how Treasure worked. She explained that the investor's money would be pooled with other investor proceeds to purchase real estate, which Treasure would own and maintain. Gray described Treasure's real estate holdings as profitable. Gray explained that the real estate generated income, principally from rents. That income, she explained, funded the interest payments made to Treasure's investors. And after Treasure finished making the agreed-upon interest payments, Gray explained, it would then return all of the principal back to the investor.

28.     During the consultations, Gray showed prospective investors a large book filled with photographs of what she represented to be some of Treasure's properties, as well as purported testimonials from satisfied investors and photocopies of checks that Treasure had paid to investors. She also showed Treasure's marketing

materials promising high returns.

29.     Gray told at least one investor that her investment with Treasure was risk free. She told another that Treasure had ample "reserves" to pay back investors if the business struggled or if investors chose to redeem their investment early.

30.     Gray oftentimes represented that Treasure offered a qualified Individual Retirement Account ("IRA"), which meant an investor could rollover an IRA or 401(k) proceeds into Treasure on a tax-free basis. This was particularly important to retirees and the beneficiaries of severance agreements – two types of investors defendants targeted.

31.     Gray would oftentimes call the securities firm at which a prospective investor held an IRA – with the investor on the phone. During that phone call, and as part of the rollover process, she represented to the customer service representative – and to the prospective investor – that Treasure was a qualified IRA.

32.     Gray told at least one prospective investor that a specific self-directed IRA firm – which she identified by name – served as Treasure's custodian. Gray went so far as to have the prospective investor fill out that custodian's forms, and asked that the completed forms be returned to her. Gray said she would forward the forms to the custodian. The investor wrote a check to Gray, who in turn gave the investor a receipt in which Gray promised to deposit the money "in [the investor's] new Self Directed IRA through Treasure Enterprise via [the IRA custodian] on her behalf." The receipt is signed by Gray and witnessed by a Treasure employee.

33.     None of this was true. Treasure did not have a qualified IRA or an IRA custodian. Rather, Treasure simply deposited checks made payable to "Treasure

Enterprise IRA f/b/o [investor name]" into its non-IRA business checking account. That's the same account in which Treasure kept the rest of its money, including income from its real estate properties.

34.     Holley knew about Gray's lies about Treasure having a qualified IRA. He was a signatory on Treasure's checking account. Thus, he saw investor checks payable to "Treasure Enterprise IRA" deposited into Treasure's general checking account. In December 2014, Holley, Gray, and Treasure were sued by an investor. In the complaint the investor alleged that she received tax penalty notices from the Internal Revenue Service because Treasure was not an IRA – contrary to Gray's representations. Defendants ultimately settled with the investor. Yet even after the lawsuit was settled, Gray continued lying to prospective investors about depositing their money in a Treasure IRA, as evidenced by the resulting checks made payable to "Treasure Enterprise IRA."

35.     Those weren't defendants' only lies to prospective investors. Prospective investors were told that Treasure investors could count on a fixed interest payment at regular intervals for a defined period of time. They were told that if Treasure investors were *ever* unsatisfied – even before the promissory note came due – Treasure would return the principal upon request. Better still, Treasure would not penalize the investor for an early withdrawal. But whenever it was that they chose to redeem, defendants told investors, Treasure would promptly return their entire principal back to them. As Treasure's investors have since learned, none of that was true.

36.     Gray's and Holley's pitches served their intended purpose. Since

February 2015, approximately 83 people from at least 14 states collectively invested about $6.7 million with Treasure.

37.     Once someone decided to invest in Treasure, the investment would be documented with a promissory note reflecting the principal amount, the interest rate, and the duration of the note.

38.     Gray or Holley signed the promissory notes on Treasure's behalf.

39.     Oftentimes defendants would also give the investor an account statement projecting the investment's performance. In the document, defendants would compare what the investor would receive from Treasure (which varied, but was generally between 7%-10%) with various alternatives, including the investor's returns had they stayed in their previous investment vehicle (generally calculated at 00.25% rate of return); had they invested the average rate of return offered by a CD (generally calculated at 00.65% rate of return); or had they invested in the stock market (generally calculated at 2.5% annual rate of return). In defendants' projections, Treasure always dramatically outperformed the alternative investment options.

### Treasure's Financial Condition Deteriorates, But Defendants Continue Touting It As A Successful, Profitable Investment Opportunity

40.     Defendants touted Treasure as a real estate company that earned significant profits for its investors from income earned on its large and lucrative real estate portfolio. Defendants advertised that Holley's businesses "generated millions of dollars in annual sales in business." The truth was far different. From February

2015 to the present, while Treasure's obligations to its investors grew steadily, the income it earned from its real estate in order to meet those obligations did not come close to keeping pace. As this chasm grew, Treasure found itself increasingly pinched for money.

41.     In response, defendants stopped meeting their obligations to Treasure's investors. They made fewer of the interest payments required of Treasure under the promissory notes. And they increasingly disregarded investors' redemption requests. Several investors sued to get their money back.

42.     Investors also filed complaints with the State of Michigan's Department of Licensing and Regulation ("LARA"). On August 11, 2016, LARA issued a cease-and-desist order against defendants barring them from selling unregistered securities in Michigan, and from making any misstatement of material fact in violation of Michigan law. On January 13, 2017, LARA instituted a cease-and-desist order against Gray, barring her from selling unregistered securities in Michigan and from making any misstatement of material fact in violation of Michigan law.

43.     Instead of disclosing this information to investors, defendants lied to investors about the LARA proceedings. They did so in order to manufacture a pretext for Treasure's inability to honor investors' redemptions requests. Gray misrepresented to investors that LARA had frozen Treasure's "millions of dollars in assets," and that it had ordered Treasure to cease repayment to investors pending resolution of the action. Gray told another investor that Treasure could not redeem any investment until a LARA-ordered audit was completed. She told yet another investor that her redemption request could only be honored after Treasure complied

with LARA's demands that Treasure liquidate some or all of its real estate holdings. These were all lies.

### Defendants Solicit New Investment Proceeds, Which They Clandestinely Use To Pay Off Earlier Investors

44.     As Treasure struggled financially, Holley and Gray continued their solicitation efforts in an effort to keep their failing enterprise afloat. But they never disclosed Treasure's dire financial state to prospective investors during their solicitation efforts. Nor did they disclose that Treasure was defaulting on its obligations to its preexisting investors, or that several of these investors were suing defendants.

45.     Rather, defendants falsely claimed that Treasure was a successful real estate company that was making significant profits for its investors from its portfolio of commercial and residential properties. And they continued to advertise Treasure's supposedly "guaranteed" interest payments and its money back guarantee.

46.     These misrepresentations worked, yielding fresh investor proceeds that flowed into Treasure's accounts.

47.     Defendants promised these new investors that their money would be used to buy real estate. Oftentimes that was a lie. In some instances, defendants instead used new investor proceeds to pay Treasure's preexisting obligations to its preexisting investors – including interest payments and the repayment of principal.

48.     Defendants oftentimes treated fresh investment proceeds as hush money to quiet complaining, preexisting investors. In October 2015, for instance, Treasure

ignored an investor's redemption request for her $200,000 investment. The investor responded by filing a complaint with the State of Michigan, and by filing a lawsuit against defendants. To buy her off, defendants successfully solicited a new investor and used $100,000 of his investment proceeds to settle the lawsuit. Defendants never told the new investor that his money would be used in this manner. Rather, he was told that his money would be deposited in a Treasure IRA account and invested in real estate. That was a lie.

49.    As of February 2017, Treasure was past due on approximately 51 promissory notes for 43 investors, totaling nearly $2 million. Treasure lacks the money to repay these past due obligations, let alone the means to honor its continuing, significant obligations to its current investors.

50.    The promissory notes constituted securities. Treasure Enterprise pooled the investors' funds into a single bank account. Investors were told both orally and in writing that their funds would be used to purchase and manage real estate. Investors were led to believe that the profits generated from this purchase and management of real estate would be used to pay their promised interest. Thus, the profits and losses of each investor were tied to the profits and losses of other investors. The investors had no control over how their funds would be used after they invested.

51.    Defendants offered and sold the promissory notes using the mail.

## COUNT I

### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### (Against All Defendants)

52.     Paragraphs 1 through 51 are realleged and incorporated by reference as though fully set forth herein.

53.     By virtue of the conduct alleged herein, defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

54.     In engaging in the conduct described herein, defendants acted knowingly and/or with a reckless disregard for the truth and/or negligently.

55.     By reason of the foregoing, defendants have violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 (Against All Defendants)

56.     Paragraphs 1 through 51 are realleged and incorporated by reference.

57.     As more fully described in paragraphs 1 through 51 above, defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

58.     Defendants knew, or were reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 51 above.

59.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT III

### Violations of Sections 5(a) and 5(c) of the Securities Act (Against All Defendants)

60.     Paragraphs 1 through 51 are realleged and incorporated by reference.

61.     Treasure did not file a registration statement, nor was one in effect with the SEC, in connection with the aforementioned promissory notes.

62.     By engaging in the conduct described above, defendants, directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed and or was in effect as to such securities, and no exemption from registration was available.

63.     By reason of the activities described herein, defendants, singly or in concert, directly or indirectly, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT IV

### Control Person Liability
### (Against Holley)

64.     Paragraphs 1 through 51 are realleged and incorporated by reference.

65.     By virtue of the conduct alleged herein, Treasure committed violations of Sections 10(b) [15 U.S.C. §78j(b)] and Rules l0b-5 [17 C.F.R. § 240.10b-5] of the Exchange Act, and Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)] as described in Count I and Count II above,

which are incorporated by reference as if fully set forth herein.

66.     As set forth above, during the relevant period, Holley directly or indirectly, controlled Treasure. As its president, Holley controlled the day-to-day affairs of Treasure. Holley enjoyed the power to direct Treasure's policies, operations, and statements to investors. Indeed, Holley spearheaded and led the solicitation efforts that succeeded in attracting many, if not most, of Treasure's investors. Holley was a culpable participant in the fraudulent conduct described above and knowingly or recklessly induced many of the material misrepresentations alleged herein.

67.     Holley directly or indirectly controlled Treasure within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

68.     Holley knowingly or recklessly, directly or indirectly, induced acts constituting violations of Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

69.     Holley is liable as a control person for Treasure's violations of Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]. Accordingly, pursuant to Section 20 of the Exchange Act [15 U.S.C. § 78t(a)], Holley is liable jointly and severally with and to the same extent as Treasure and Gray.

## COUNT V

### Equitable Claim With Respect to Relief Defendants
### (Against Relief Defendants)

70.     Paragraphs 1 through 51 are realleged and incorporated by reference.

71.     Relief Defendants, directly or indirectly, received funds or benefited from the use of such funds, which are the proceeds, or are traceable to the proceeds, of defendants' unlawful activity alleged in paragraphs 1 through 51.

72.     Relief Defendants have no legitimate claim to these funds that they received or from which they otherwise benefited, directly or indirectly.

73.     Based upon the allegations set forth above, the Relief Defendants have been unjustly enriched by their direct or indirect receipt of or benefit from investor funds.

74.     Carleen Holley is married to defendant Larry Holley, and a substantial amount of investor funds have been transferred to Carleen Holley's joint account with Larry Holley. She has also made several cash withdrawals from Treasure's account. While some of the money she received may be related to discrete work she has performed for Treasure, there are many money transfers for which there is no apparent legitimate purposes.

75.     Kingdom Asset was founded and is controlled by defendant Holley. Kingdom Asset shares the same address as Treasure. Its funds have been intermingled with Treasure's funds. Kingdom Asset has been the recipient of ill-gotten gains. Treasure has transferred funds from its commingled checking account to Kingdom Asset.

76.     The SEC is entitled to an order requiring the Relief Defendants to disgorge all of the proceeds of investor funds they received or from which they benefited, either directly or indirectly.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

## I.

Issue findings of fact and conclusions of law that defendants Treasure Enterprise LLC, Patricia Enright Gray, and Larry Allen Holley committed the violations charged and alleged herein.

## II.

Enter an Order of Permanent Injunction restraining and enjoining defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 5(a) and (c) [15 U.S.C. §§ 77e(a) and 77e(c)] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

## III.

Issue an Order requiring defendants to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

**IV.**

With regard to the defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Enter an Order requiring relief defendants Carleen Renee Holley and Kingdom Asset Management LLC to disgorge all funds they received from defendants' ill-gotten gains or by which they have been unjustly enriched, including all investor funds transferred to them or used for their benefit, wherever located, including jurisdictions outside of the United States, including prejudgment interest thereon.

**VI.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

The Commission hereby requests a trial by jury.


Dated: March 28, 2017

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: /s/ Jonathan S. Polish
Jonathan S. Polish (IL 6237890)
John E. Birkenheier (IL 6270993)
Steven L. Klawans (IL 6229593)
Ana P. Doncic (IL 6297413)
Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE COMMISSION**
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Email:  DoncicA@sec.gov

**DANIEL L. LEMISCH**
Acting United States Attorney

Peter A. Caplan
Assistant United States Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313) 226-9784
P-30643
Email: peter.caplan@usdoj.gov